| | | | | |
|---|---|---|---|---|
| Minute Order Form (06/97) | | | | |

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | JAMES B. ZAGEL | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 02 C 4326 | DATE | AUG 0 4 2003 |
| CASE TITLE | Robert Edwin Greer, Jr. (#B24168) vs. Sgt. J. McCurry, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due ___.
(3) ☐ Answer brief to motion due ___. Reply to answer brief due ___.
(4) ☐ Ruling/Hearing on ___ set for ___ at ___.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on ___ set for ___ at ___.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on ___ set for ___ at ___.
(7) ☐ Trial[set for/re-set for] on ___ at ___.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to ___ at ___.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] For the reasons set forth in the accompanying Memorandum Opinion and Order, the defendants' motion for summary judgment [#32] is granted and the plaintiff's cross-motion for summary judgment [#31] is denied. The plaintiff's motion "to recognize" his amended complaint [#40] is denied. The Clerk is directed to enter judgment in favor of the defendants pursuant to Fed. R. Civ. P. 56. The case is terminated. The parties are to bear their own costs.
(11) ■ [For further detail see attached Memorandum Opinion and Order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| | Notices mailed by judge's staff. | AUG 05 2003 date docketed |
| | Notified counsel by telephone. | |
| ✓ | Docketing to mail notices. | docketing deputy initials |
| ✓ | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | date mailed notice |
| mjm | courtroom deputy's initials | Date/time received in central Clerk's Office mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **ROBERT GREER, #R-14159** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | NO. 02 C 4326 |
| | ) | |
| **SGT. J. McCURRY, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

JAMES B. ZAGEL, District Judge:

The plaintiff, currently a state prisoner, has brought this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. The plaintiff claims that while he was an inmate at the Kane County Jail, the defendants, three correctional officers, violated the plaintiff's constitutional rights by using unjustified force against him and by subjecting him to inhumane conditions of confinement. More specifically, the plaintiff maintains that the defendants McCurry and Bailey repeatedly assaulted him, in addition to strapping him naked to a restraint chair for several hours in full view of the entire gallery, all the while taunting and threatening him. The defendant Thomas allegedly stood by without intervening while the other two officers severely mistreated the plaintiff in his presence. This matter is before the court for consideration of the parties' cross-motions for summary judgment. For the reasons stated in this order, summary judgment will be granted in favor of the defendants.

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Prime Northgate Plaza Ltd. Partnership v. Lifecare Acquisitions Corp.*, 985 F. Supp. 815, 817 (N.D. Ill. 1997). In determining whether factual issues exist, the court must view all the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Walker v. Northeast Regional Commuter Railroad Corp.*, 225 F.3d 895, 897 (7th Cir. 2000).

However, Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 393 (7th Cir. 1997), *cert. denied*, 523 U.S. 1118 (1998).

### Facts

The defendants have filed a statement of uncontested material facts pursuant to Local Rule 56.1. Together with their summary judgment motion, the defendants served on the plaintiff the required notice under Local Rule 56.2, advising the plaintiff what he needed to do to contest the motion, and specifically what he needed to do to dispute the defendants' statements of uncontested facts. In addition, the court's Minute Order of April 28, 2003, previously admonished the plaintiff about the requirements of Local Rule 56.1. Despite this notice, the plaintiff's statements of facts both in support of his own motion for summary judgment and in opposition to the defendants' motion for summary judgment are essentially devoid of any citations to the evidence in the record that might substantiate the plaintiff's allegations. Unsupported statements in a brief are not evidence

and cannot be given any weight. *See, e.g., Johnson v. Spiegel, Inc.*, No. 02 C 0680, 2002 WL 1880137, at *4 (N.D. Ill. Aug. 15, 2002) (Pallmeyer, J.), *citing In the Matter of Morris Paint and Varnish Co.*, 773 F.2d 130, 134 (7th Cir. 1985).

The plaintiff's failure to respond properly to the defendants' statements of material facts as directed warrants disregard of any contrary assertions he makes in his briefs. *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003):

> Local Rule 56.1's enforcement provision provides that when a responding party's statement fails to controvert the facts as set forth in the moving party's statement in the manner dictated by the rule, those facts shall be deemed admitted for purposes of the motion. . . . A district court is not required to "wade through improper denials and legal argument in search of a genuinely disputed fact." *Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). And a mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material. *Edward E. Gillen Co. v. City of Lake Forest*, 3 F.3d 192, 196 (7th Cir. 1993).

The Court therefore finds that the following facts, gathered from the defendants' statement of facts and the evidence in the record, are uncontested for purposes of summary judgment:

The plaintiff, Robert Greer, currently a state prisoner, was a pretrial detainee at the Kane County Adult Correctional Facility at the time of the events giving rise to this action. (Defendants' Exhibit C, Deposition of Robert Greer, Jr., at p. 4.) The defendants James McCurry, Larry Bailey and Prue Thomas were correctional officers at the jail at all times relevant to this lawsuit. (Complaint, pg. 2, Part II, "Defendant(s)" section.) [By Minute Order of June 27, 2002, the Court dismissed the complaint as to all other defendants pursuant to 28 U.S.C. § 1915(e)(2)(B).]

On August 27, 2001, correctional officers searching for narcotics conducted a "shakedown" of the plaintiff's cellblock with a K-9 team. (Defendants' Exhibit D, Incident Report, p. 2.) During the shakedown, the inmates were asked to step into the hallway so that they could be personally

3

searched while their cells were inspected. (*Id.*, pp. 4-5.) The defendant Thomas searched the plaintiff. (Defendants' Exhibit I, Affidavit of Officer Prue Thomas, ¶ 2.)

The defendant McCurry noticed that the plaintiff was unruly and verbally abusive toward the officers, making remarks such as, "You can't do shit to me, I've got nothing to live for." (Exhibit D, p. 2.[1]) McCurry additionally noted that the plaintiff was "emotional and teary eyed." (*Id.*) ]

The plaintiff repeatedly expressed suicidal ideations (e.g., "I'm dead already;" "I lost everything, I got nothing left to lose;" "If I want to kill myself you can't stop me;" he also warned that his family would certainly sue the Sheriff's Office if he were to commit suicide. (*Id.*) Accordingly, McCurry decided to transfer the plaintiff to a "high suicide watch" cell. (Defendants' Exhibit I, Affidavit of James McCurry, ¶ 2.) The plaintiff's placement on suicide watch was not intended to punish the plaintiff for any offense, but rather for his protection and for the protection of others. (*Id.*)

Once the plaintiff was placed in the search cell (a room where mattresses are kept), McCurry informed the plaintiff that he would have to be strip searched. McCurry warned the plaintiff that if he refused to submit to a strip search, he would have to be maced. (Complaint, page 2 of Statement of Claim.) However, the plaintiff voluntarily complied and was not maced.[2]

The plaintiff was placed in a safety restraint chair pending his transfer to the high risk unit. (Attachments to Exhibit D, Supplemental Reports by Officers Camacho and Goncher.) None of the officers' reports reflects Officer Bailey's participation in the process. (*Id.*) In circumstances where

---

[1]There appears to be an erroneous date on page 2 of the incident report.

[2][The exhibits cited by the defendants do not entirely substantiate this paragraph, but the plaintiff agrees with the defendants' assertions in his response to their statement of facts.]

4

suicide prevention is warranted, removal of clothing and personal items is standard procedure at the jail to protect the individual from himself. (Defendants' Exhibit G, "Standard Operations Procedural Manual," ¶ B(2).) Accordingly, the plaintiff was left naked, but he was given a "suicide blanket" with which to cover himself. (Plaintiff's deposition, p. 23.)

A nurse or medical technician checked in on the plaintiff at 6:50 p.m. and 8:40 p.m. that evening and noted that he made no complaints of health problems or injuries. (Defendants' Exhibit E, Plaintiff's Medical Records.) The plaintiff also largely corroborated the officers' account when he spoke to his social worker at 9:10 the next morning, although he asserted that the officers had been "rough." (*Id.*)

The plaintiff managed to free himself from his restraints each time they were refastened, eventually reclining on the floor on his blanket in order to sleep. (Plaintiff's Deposition, pp. 23, 25, 27-28.) The plaintiff was on his floor on the blanket at about 11 p.m. that evening when Officers Holloway and Pleitt arrived and transferred him to the high risk unit to be placed on "suicide watch." (Exhibit D, Holloway Supplemental Report.)

The following day, August 28, 2001, at about 6:00 p.m., the defendant McCurry entered the high risk unit to look in on the inmates housed there. (Defendant's Exhibit D, McCurry's 8/28/01 Incident Report.) The plaintiff motioned to McCurry, who took this as a request that the plaintiff wished to speak to him. (*Id.*). [In his response to the defendants' statement of facts, the plaintiff explains that he was merely "giving him the finger."] McCurry entered the cell, whereupon the plaintiff angrily asked him, "Are you satisfied now? Are you happy now that I am on suicide watch?" (*Id.*).

5

When McCurry informed the plaintiff that he would remain on suicide watch until he was no longer a threat to himself, the plaintiff became "highly emotional" and aggressively attempted to jump up directly in front of the sergeant. (*Id.*) McCurry prevented further advance by placing an open hand on the plaintiff's chest and forcing him back down onto his bed. (*Id.*; *see also* McCurry's testimony to Internal Affairs Investigators, attached as unmarked exhibits to plaintiff's amended complaint, at p. 13.) A struggle ensued, as the plaintiff resisted. (*Id.*) To get the plaintiff under control, McCurry placed him in an "escort wristlock." (*Id.*) McCurry then escorted the plaintiff to the segregation block to continue his suicide watch. (*Id.*)

The process of moving the plaintiff from one cell to another lasted less than two minutes. (Defendants' Exhibit B, Surveillance Video, 18:00:31 to 18:02:19.) For part of the transport, McCurry guided the plaintiff by grasping his hair in addition to using a wristlock. (*Id.*) McCurry did not bend the plaintiff's head backwards, run with him, or ram him into anything. (*Id.*; *see also* Defendants' Exhibit H, Affidavit of James McCurry, ¶ 8; Defendants' Exhibit B, Surveillance Video.) McCurry and other officers placed the plaintiff into a cell in block 143. (Surveillance Video; *see also* Defendants' Exhibit D, Incident Report and accompanying Supplementary Reports.) The plaintiff was unclothed for the brief walk to block 143 because McCurry was concerned with accomplishing the transfer as quickly as possible due to the plaintiff's increasing aggressiveness. (McCurry Affidavit, ¶ 9.)

When the plaintiff reached the cell, he refused orders to lie flat on the bed, instead sitting up with his fists clenched. (Defendants' Exhibit D.) Consequently, McCurry "distracted" the plaintiff with "two open-handed, diffused strikes to the pressure sensitive area on the side of the inmate's neck." (*Id.*) The plaintiff then complied with McCurry's verbal directives. (*Id.*) Because the

6

plaintiff complied with McCurry's order after the first two strikes to the neck, McCurry refrained from the third step of the measure, a "brachial stun." (Unmarked Exhibit to Plaintiff's Amended Complaint, McCurry testimony at p. 22.) The plaintiff was given a blanket and a mat and was left in segregation for a couple of hours before he was returned back to the high risk unit. (Plaintiff's Deposition, pp. 49-50.)

At about 8:30 that evening, McCurry accompanied a nurse who went to examine the plaintiff in the high risk unit. (Defendants' Exhibit D(3), Supplementary Report.) The plaintiff told the nurse that McCurry had beaten him and punched him in the face. (*Id.*) Nurse Lyon took photographs of the plaintiff's head, face and upper body. (*Id.*)

When the nurse temporarily left the cell to get an ice pack, the plaintiff began verbally abusing McCurry. (*Id.*) The plaintiff threatened to sue McCurry and taunted, "Why don't you beat my ass and leave some marks." (*Id.*) When McCurry told the plaintiff to be quiet, the plaintiff attempted to rise from his bed and stand. (*Id.*) McCurry pushed the plaintiff with his open hand back down onto the bed. (*Id.*) The plaintiff bumped his head against the wall as he was sent back down on his bed. (*Id.*) The plaintiff did not say another word, but when the nurse returned with the ice pack, the plaintiff told her that McCurry was beating him again. (*Id.*)

The photographs taken by the nurse reflect no visible injuries on the plaintiff's person aside from a bruise or abrasion on his right shoulder. (*See* photographs attached to incident reports, Defendants' Exhibit D.) The plaintiff nevertheless insists in his opposing brief that he sustained injuries "that did not show up in the pictures" and that his injuries would have been more apparent had "color pictures" been taken. However, the nurse noted on the plaintiff's chart that he had only a small abrasion on his right shoulder, scratches on his arm, redness and swelling on his left jaw and

7

neck area, and a small raised area on the back of his head, all consistent with McCurry's statements. (Defendants' Exhibit E, medical entry of 8/28/01.) By 10:50 p.m., fifty minutes later, the plaintiff had no medical complaints when a nurse looked in on him. (*Id.*) At 11:50 p.m., he again "denie[d] any pain or discomfort." (*Id.*)

McCurry states in his affidavit that on both occasions when he resorted to force, he believed he was using the minimum force needed to protect the plaintiff from himself, as well as to protect himself (McCurry) and others from the plaintiff. (Defendants' Exhibit H, Affidavit of James McCurry, ¶ 4.) McCurry did his "best" to avoid any unnecessary injury to the plaintiff. (*Id.*) The plaintiff's placement in a restraint chair and his transfer to the high risk unit were likewise motivated out of safety considerations, and not as punitive measures. (*Id.*, ¶¶ 2, 6.)

The defendant Thomas was working in another area of the jail and had no contact with the plaintiff on August 28, 2001. (Defendants' Exhibit I, Affidavit of Prue Thomas, ¶¶ 4-5.)

The plaintiff's Medical Progress Notes indicate that the social worker who interviewed him on August 28 and August 29, 2001, agreed with the need to maintain a suicide watch due to the plaintiff's unpredictable behavior and his unwillingness to guarantee his personal safety; in fact, the plaintiff told the social worker that he preferred to stay in the high risk unit for the time-being. (Defendants' Exhibit E.)

In the days following the disturbances underlying this action, the plaintiff received no further medical treatment for the "shoulder wound, bumps, bruises" he sustained during his altercations with the staff. (Plaintiff's Deposition, pp. 57-58.) While conceding that his injuries were not serious, the plaintiff nevertheless declares that he submitted request slips for pain medication and other medical attention. (*Id.*, pp. 55-58.)

## Discussion

In light of the plaintiff's failure to submit a properly supported statement of facts, there is no genuine dispute as to any material of fact, and the defendants have established that they are entitled to judgment as a matter of law. The defendants neither used excessive force against the plaintiff nor subjected him to punitive conditions of confinement without due process. Accordingly, the plaintiff's motion for summary judgment must be denied and the defendants' cross-motion for summary judgment must be granted.

### I. Plaintiff's Motion "to Recognize" the Amended Complaint

The plaintiff's motion "to recognize" his amended complaint is denied. The plaintiff has simply re-submitted copies of the amended complaint he filed last December. By Minute Order of December 4, 2002, the court rejected the proposed amended pleading, ruling that the plaintiff had no cause of action against correctional administrators for failing to punish the alleged wrongdoers after the fact. The court provided the following guidance:

> If the plaintiff wishes to submit a second amended complaint further elaborating on his claims against the three remaining defendants, he may file a renewed motion for leave to amend, accompanied by a proposed second amended complaint. The second amended complaint should name only the three remaining defendants and should stand complete on its own, without reference to prior pleadings. *See* Minute Order of November 7, 2002.

Despite the court's admonitions, the plaintiff declined to file a second amended complaint. He now offers a photocopy of the same, unacceptable document, having made no effort to rectify pleading deficiencies. The court will therefore disregard the amended complaint. Nevertheless, while the court need not "scour the record to make the case of a party who does nothing," *see Johnson v. Gudmundsson*, 35 F.3d 1104, 1116, n. 9 (7th Cir. 1994), the court has reviewed the exhibits attached to the amended complaint. *But see Tatalovich v. City of Superior*, 904 F.2d 1135,

1139 (7th Cir. 1989) (the court is not required to comb the record for evidence contradicting the moving party's statements in support of its motion for summary judgment).

## II. The Defendant McCurry's Use of Force

Correctional officers have the right to use reasonable force against a prison inmate to enforce discipline and to maintain institutional security. *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). However, it is well settled that the intentional use of excessive force by prison guards against an inmate without penological justification constitutes cruel and unusual punishment violative of the Eighth Amendment. *Id.*; *Knox v. Wainscott*, No. 03 C 1429, 2003 WL 21148973, at *6 (N.D. Ill. May 14, 2003 (Manning, J.). (While the Fourteenth rather than the Eighth Amendment applies to pretrial detainees, the same basic standards govern. *See Salazar v. City of Chicago*, 940 F.2d 233, 239-240 (7th Cir. 1991)). Whenever correctional officials stand accused of using excessive physical force in violation of the Constitution, "the core judicial inquiry is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *DeWalt v. Carter*, 224 F.3d 607, 619 (7th Cir. 2000), *quoting Hudson*, 503 U.S. at 6-7 (internal quotations omitted).

In determining whether pain was unnecessarily and wantonly inflicted, the court must examine a variety of factors, including "the need for an application of force, the relationship between that need and the force applied, the threat reasonably perceived by the responsible officers, the efforts made to temper the severity of the force employed, and the extent of the injury suffered by the prisoner." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001), *quoting DeWalt, supra*, 224 F.3d at 619.

Under the circumstances of this case, the defendant McCurry's admitted use of some degree of force did not violate the plaintiff's constitutional rights. Each of the above considerations militates against a finding that the defendant used unreasonable force. First, McCurry specifically states in his affidavit that he was acting in good faith to protect the plaintiff from harming himself or others, and not out of anger, malice, or punitive intent. *See* McCurry Affidavit, ¶ 2. The officers' contemporaneous incident reports all reflect that the plaintiff was not just verbally abusive, but that he took aggressive stances against the officers on both August 27 and August 28, 2001 He repeatedly stated that he had "nothing to lose," refused to cooperate with the officers, and made combative gestures such as jumping up in McCurry's face and balling his fists as if he were preparing to fight.

Second, the application of force was necessitated by the plaintiff's angry words, aggressive gestures, expressions of self-destruction and recklessness, and refusal to comply with McCurry's orders. For the same reasons discussed above, McCurry had to resort to force in order to subdue the plaintiff and make him submit to officers' directives.

Third, McCurry used only the degree of force necessary to temper the plaintiff's aggression and compel his compliance. McCurry declares in his affidavit that he "used the minimum force needed . . . and was careful at all times to do my best to avoid any injury to inmate Greer." *Id.*, ¶ 4. On August 27, 2001, for example, McCurry only threatened to mace the plaintiff; when the plaintiff then allowed a strip search, McCurry did not mace him. Similarly, the next day, when the plaintiff finally lay on the bed as directed after receiving two "diffused, open-handed strikes," McCurry did not follow through with a brachial stun. And when the plaintiff lunged out of his bed at McCurry shortly thereafter, McCurry simply used the palm of his hand to push the plaintiff back down.

Finally, the plaintiff's minor injuries reflect a show of force that was not excessive. The plaintiff admitted at his deposition that he sustained only minor injuries: "He didn't inflict, you know, any bone breakage or anything like that, just the shoulder wound, bumps, bruises." (Plaintiff's Deposition, p. 57.) The plaintiff did not ask to see a doctor. (*Id.*, p. 54.) The photographs taken by the nurse on August 28, 2001, reflect no visible injuries on the plaintiff's person aside from a scraped right shoulder. (*See* photographs attached to Defendants' Exhibit D.) The nurse detected only the shoulder abrasion on his right shoulder, scratches on his arm, redness and swelling on his left jaw and neck area, and a small raised area on the back of his head. (Defendants' Exhibit E, medical entry of 8/28/01.) At 10:50 p.m., fifty minutes later, the plaintiff had no medical complaints. (*Id.*)

While significant injury is not required to state a cause of action under 42 U.S.C. § 1983, a civil rights claim ordinarily cannot be predicated upon a *de minimis* use of physical force. *DeWalt*, 224 F.3d at 619. Thus, not every push or shove by a prison guard violates a prisoner's constitutional rights. *Id.*, citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2nd Cir. 1973). Indeed, "the Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Outlaw*, 259 F.3d at 838, relying on *Hudson*, 503 U.S. at 9-10. Therefore, not every "malevolent touch by a prison guard" gives rise to a federal cause of action, even if the use of force in question "may later seem unnecessary in the peace of a judge's chambers." *Id.* The absence of any significant injuries belies the plaintiff's claim that the defendants "beat" him. The use of force employed by McCurry falls short of what is required for the plaintiff to prevail on a claim of unreasonable force under the Fourteenth Amendment.

Even separate and apart from the plaintiff's failure to submit a properly supported statement of facts as required by the court's local rules, many of his assertions are refuted by unassailable evidence. For example, the surveillance footage for August 18th clearly shows McCurry marching the plaintiff from the high risk unit to the segregation unit. *See* Defendants' Exhibit B. The court recognizes that portions of the encounter when the parties are in cells are not captured on tape; however, the video does substantiate McCurry's claim that he simply grasped the plaintiff by his long hair and in a wristlock as he escorted him. The plaintiff is walking in a normal gait and is in no obvious pain. The video completely negates the plaintiff's claim that his head was pulled back violently, that McCurry ran with him, or that McCurry "smashed, crushed or hurled" the plaintiff against doors, walls, or lock plates. As McCurry noted to an internal affairs investigator, the plaintiff would have had to have had his head bent down to his waist in order to run into the lock plate, as lock plates are located at the door handle. *See* McCurry testimony at p. 19. The time stamped videotape also shows McCurry and other officers leaving the area immediately after placing the plaintiff in the holding cell; the transfer process took less than two minutes. The court questions when McCurry would have had the opportunity to inflict a beating.

The surveillance video likewise refutes the plaintiff's claim that Bailey joined in an attack against him. Bailey is seen on the videotape for just over two minutes, running to the scene of the disturbance along with other correctional staff, but he is never alone with or even near the plaintiff. The various officers' incident reports make no mention of Bailey participating in any efforts to restrain the plaintiff or move him from one cell to another and Bailey himself completed no incident report. [As the plaintiff points out, one officer later told internal affairs investigators that he thought

13

he had seen McCurry and Bailey both enter cell block 143 after the plaintiff, but that officer's statement was very tentative, as well as out of line with other officers' accounts.]

The plaintiff's documented injuries, furthermore, are entirely consistent with McCurry's incident reports on the dates of the events, his subsequent statements to internal affairs investigators, and his current affidavit. Although the small scrape on the plaintiff's right shoulder is unexplained, redness and swelling on his left jaw and neck area correspond to McCurry's admitted use of "diffused strikes," and the bump on the back of his head corresponds to his hitting the wall when McCurry pushed him back down on the bed. In contrast, the nurse detected no injuries to the plaintiff that corroborate his allegations of an assault. No medical evidence supports the plaintiff's description of a beating; indeed, he has never described any injuries, merely vaguely alluding to unspecified injuries that did not appear in the photographs.

In sum, even assuming (without finding) that McCurry was perhaps a little "rough," as the plaintiff contends, technical batteries, angry words, and passing thumps fall outside the ken of constitutional review. The plaintiff's own intractability, angry demeanor, and reckless statements of hopelessness and self-destruction triggered McCurry's use of relatively mild force. Under the circumstances of this case, the plaintiff is not entitled to damages under 42 U.S.C. § 1983.

## II. The Plaintiff's Temporary Placement in a Restraint Chair and in the Disciplinary Unit

The plaintiff likewise has no triable due process claim with respect to the measures taken in conjunction with his being classified as a "high suicide risk." Correctional officers are constitutionally obligated both to provide inmates with necessary medical care, *Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999), and to take reasonable measures to ensure their safety. *Hudson v. Palmer*, 465 U.S. 517, 526 (1984); *Washington v. LaPorte County Sheriff's Department*, 306 F.3d

515 (7th Cir. 2002). If custodial officials know or should know of a particular vulnerability to suicide of an inmate, then the Fourteenth Amendment imposes on them an obligation not to act with reckless indifference to that vulnerability. *See, e.g., Hall v. Ryan*, 957 F.2d 402, 405 (7th Cir. 1992); *Colburn v. Upper Darby Township*, 838 F.2d 663, 669 (3rd Cir. 1988), *cert. denied*, 489 U.S. 1065 (1988).

Here, McCurry observed that the plaintiff was in an emotional state, teary-eyed, and making many anguished and hopeless statements ("I've got nothing to live for;" "I'm dead already;" "I ain't got shit to live for, man, I lost everything;" "If I want to kill myself I'll do it and you can't stop me."). In fact, the plaintiff speculated about the lawsuit that McCurry would face if the plaintiff did commit suicide. McCurry was therefore justified in placing–perhaps even required to place–the plaintiff on "suicide watch" to prevent him from harming himself. *Compare Payne v. Churchich*, 161 F.3d 1030, 1041 (7th Cir. 1998) (prison officials cannot act with deliberate indifference to a substantial suicide risk). McCurry had an affirmative obligation to take steps to protect the plaintiff when he expressed suicidal ideations.

McCurry specifically followed institutional protocol in removing the plaintiff's clothing and personal items. (Defendants' Exhibit G, "Standard Operations Procedural Manual," ¶ B(2). The plaintiff's social worker interviewed him and agreed with the decision to keep him on suicide watch. *See* Defendants' Exhibit E, Plaintiff's Medical Progress Notes of August 27 and 28, 2001.) A nurse repeatedly checked on the plaintiff to make sure he was all right. *Id.*

Although the plaintiff was naked and placed in a safety restraint chair for part of the time, his conditions were not so inhumane as to be disciplinary in nature. The plaintiff never received a disciplinary report and was not punished on account of his altercations with officers. McCurry testimony at p. 16. While the plaintiff was divested of clothing or any items he might use to harm

himself, he was given a blanket with which to cover himself; furthermore, a nurse confirmed that his soft restraints did not chafe his arms or legs or cut off circulation. The restraints were so loose, in fact, that the plaintiff admittedly was able to remove his restraints so that he could get out of the chair and sleep on the mat on the floor.

The plaintiff's temporary move from the high risk unit to so-called "cell block 143" (evidently a disciplinary unit) may have been a disciplinary measure, but it was a difference without a distinction- there is no evidence that the conditions in segregation are any more restrictive than those for inmates on suicide watch, where all clothing and personal articles are taken away from them. Moreover, the plaintiff remained in cell block 143 for only a short time; a lieutenant later overruled McCurry's decision to place the plaintiff in that unit because he wanted that cell block reserved for inmates who were "serious disciplinary problems" in light of ongoing problems with gang activity during that time period. *See* McCurry statements to internal affairs investigators at p. 16.

### III. Personal Involvement of Officers Bailey and Thomas

The record fails to establish the direct, personal involvement of either Bailey or Thomas, as required by *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). "Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." *Vance v. Washington*, 97 F.3d 987, 991 (7th Cir. 1996), *cert. denied*, 520 U.S. 1230 (1997) (citations omitted).

The plaintiff claims that the defendant Thomas stood by and watched without intervening when McCurry assaulted him. A correctional official is liable for a constitutional violation committed by another if he or she has a reasonable opportunity to intervene but fails to do so. *See*

*Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000); *Lanigan v. Village of East Hazel Crest*, 110 F.3d 467, 744-78 (7th Cir. 1997); *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).

In the case at bar, however, the record establishes that Officer Thomas' only involvement in the affair is that he was one of the officers who conducted the shakedown that triggered the sequence of events underlying this lawsuit. The plaintiff alleges that when Thomas pinched one of his nipples during a pat-down and he complained, his angry protestations prompted McCurry to storm over to him. But Thomas states in his affidavit that he "was not involved or present when inmate Greer was placed in the restraint chair on August 27, 2001," and that he was not even in the male section of the Kane County Jail on August 28, 2001, when the plaintiff was moved to the disciplinary unit. *See* Defendants' Exhibit I, Thomas Affidavit, ¶¶ 3-7.) The incident reports are likewise devoid of references to Thomas' involvement, mentioning only the participation of Officers Goncher, Hughes, Camacho, Holloway and Pleitt assisting McCurry on both days. (Defendants' Group Exhibit D.) In any event, in light of the court's finding that McCurry did not use constitutionally excessive force, Thomas could not be held liable for failing to intervene when McCurry employed force against the plaintiff.

As noted in preceding paragraphs, the defendant Bailey was one of the officers who is seen on the surveillance video running in the hallway to the scene of the disturbance. However, the videotape never shows him near the plaintiff, let alone abusing him. The officers' incident reports likewise fail to mention Bailey's involvement. When Bailey spoke to investigators, he insisted that he had nothing to do with any confrontation with the plaintiff. *See* Administrative Investigation report attached as an unmarked, non-paginated exhibit to plaintiff's amended complaint; Bailey's testimony at p.4.

It should be noted that McCurry told investigators that Bailey was present during one of the disturbances, *see* McCurry testimony at p. 7–and that Bailey was subsequently disciplined for not being truthful about being elsewhere when the videotape showed him in the area. *See* Office of Internal Affairs Complaint Disposition attached to amended complaint. However, McCurry corroborated Bailey's testimony to the extent that he confirmed Bailey had taken no part in restraining the plaintiff. McCurry testimony at pp. 7, 23. The plaintiff has failed to establish either that Bailey used excessive force against him or that Bailey participated in the various incidents where the plaintiff was placed in a restraint chair or transferred from one unit to another. Summary judgment must accordingly be granted in favor of the defendant Bailey.

## Conclusion

For the reasons stated above, the plaintiff's motion "to recognize" his amended complaint (#40) is denied. The court grants the defendants' motion for summary judgment (#32) and denies the plaintiff's cross-motion for summary judgment (#31). The Clerk is directed to enter judgment in favor of the defendants. The parties are to bear their own costs.

If the plaintiff wishes to appeal this final judgment, he may file a notice of appeal with this court within thirty days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C); *Hyche v. Christensen*, 170 F.3d 769, 771 (7th Cir. 1999). If the plaintiff does choose to appeal, he will be liable for the $105 appellate filing fee irrespective of the outcome of the appeal. *Evans v. Illinois Dept. of Corrections*, 150 F.3d 810, 812 (7th Cir. 1998). Furthermore, if the appeal is found to be non-meritorious, the plaintiff may be assessed a "strike" under 28 U.S.C. § 1915(g). The plaintiff is warned that if a prisoner has had a total of three federal cases or

appeals dismissed as frivolous, malicious, or failing to state a claim, he may not file suit in federal court without prepaying the filing fee unless he is in imminent danger of serious physical injury. *Id.*

                                                                                                        _____
                                                                                                        JAMES B. ZAGEL
                                                                                 United States District Judge

Date: 4 August 2003